UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re

                                                  Chapter 11
The Brooklyn Hospital Center and                  Case No. 05-26990-CEC
Caledonian Health Center, Inc.,                          05-26992-CEC

                          Debtors.
--------------------------------------------------------x


            DECISION GRANTING DEBTORS' MOTION TO APPROVE THE
               PROPOSED KEY EMPLOYEE RETENTION PLAN


Appearances:

Lawrence Handelsman, Esq.                 Jenette Barrow-Bosshart, Esq.
Stroock & Stroock & Lavan, LLP            Otterbourg, Steindler, Houston & Rosen, PC
180 Maiden Lane                           230 Park Avenue
New York, New York 10038                  New York, New York 10169
Attorney for Debtor                       Attorney for Official Committee of
                                          Unsecured Creditors


Linda Riffkin, Esq.                       Avrum Rosen, Esq.
Office of the United States Trustee       38 New Street
271 Cadman Plaza East, Suite 4529         Huntington, New York 11743
Brooklyn, New York 11201                  Attorney for New York State Nurses'
Attorney for United States Trustee        Association




                          CARLA E. CRAIG
                   United States Bankruptcy Judge

This matter comes before the court on the motion of The Brooklyn Hospital Center ("TBHC") and Caledonian Health Center, Inc. ("CHC") (collectively, the "debtors"), the debtors and debtors-in-possession, for an order pursuant to 11 U.S.C. §§ 105(a) and 363(b), approving and authorizing the implementation of a Key Employee Retention Plan ("KERP"). The New York State Nurses' Association ("NYSNA") and the United States Trustee ("UST") objected to the approval of the KERP. A hearing was held on April 10, 2006, at which the Court heard testimony from the chairman of TBHC's board of directors (the "board") and oral argument from counsel. For the reasons set forth below, the debtors' motion is granted, provided that the debtors amend the KERP to expressly limit the total KERP payments to the first tier of employees to $600,000.00 and total KERP payments to all employees to $1.1 million in the aggregate.

## Jurisdiction

This Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334 and 157 and the Eastern District of New York standing order of reference dated August 28, 1986. This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Fed. R. Bankr. P. 7052.

## Facts

The following relevant facts are not in dispute.

TBHC was established in 1845 and is a full service, not-for-profit healthcare provider located in Brooklyn, New York. TBHC is a member of the New York-Presbyterian Healthcare System and an affiliate of the Weill Medical College of Cornell University. TBHC's board of directors consists of 20 members who possess a range of professional qualifications. TBHC's board members include lawyers, doctors, and community representatives, as well as financial

experts and business persons.  (Tr. at 6.)  The board's members also represent various ethnic, national and racial groups.  Id.  CHC, a not-for-profit subsidiary of TBHC, is a network of clinical treatment centers that offers a range of primary care and specialty care services to children and adults.  The debtors' staff includes approximately 700 physicians, surgeons and residents, and 500 nurses, who provide medical services to the debtors' patients, approximately 250,000 per year.

In 2005, TBHC started to experience serious financial difficulties, as "a number of substantial potential liabilities came home to roost."  (Tr. at 9.)  TBHC's request for a pension waiver was denied by the Internal Revenue Service and it became involved in a dispute with its malpractice insurer.  Id.  Additionally, Bank of America terminated TBHC's line of credit.  (Tr. at 10.)  These problems caused TBHC to report a $30 million loss, and left it without sufficient resources to manage its finances.  Id.

On September 20, 2005 (the "Petition Date"), TBHC and CHC each filed a voluntary petition under chapter 11 of the Bankruptcy Code.  The TBHC and CHC cases are being jointly administered for procedural purposes.  No trustee or examiner has been appointed.  On October 11, 2005, an official committee of unsecured creditors (the "Committee") was appointed.

At the hearing, TBHC offered the testimony of Jonathan Weld, a lawyer who is chairman of TBHC's board.  Mr. Weld testified that since the onset of TBHC's financial crisis, five senior administrative employees, with the rank of director or above, have left their jobs at TBHC.  (Tr. at 20.)  Two of these employees left post-petition.  Id.  Mr. Weld testified that one of the departing employees, a senior vice president, expressly stated that he was leaving at least in part because he had lost his pension plan and because he believed that he would not receive a bonus

due to TBHC's bankruptcy.  <u>Id.</u>

Mr. Weld further testified that the current senior management of the hospital includes the chief executive officer, the chief financial officer, and the chief operating officer, and that one of those individuals has been approached by a headhunter since the commencement of this bankruptcy case.  (Tr. at 6-7, 40.)  Mr. Weld testified that it was essential that these senior employees remain with TBHC because it would be very difficult in their absence for the debtor to operate and to develop its business plan to emerge from bankruptcy, and that it would be difficult for the debtor to fill those vacancies, particularly given the pending bankruptcy case.  (Tr. at 22-23.)  Mr. Weld stated that he believes that the problem of retaining talented management employees is

> particularly aggravated for an entity in bankruptcy because you are clearly cherry picked by your competition, so people receive more than the usual number of headhunter calls and enticements, and it's very hard on the other side, harder than in normal circumstances to get somebody to join you when you are in bankruptcy and there's uncertainty as to what kind of a job they will have.  So it's a multi-faceted problem.

(Tr. at 23.)

Therefore, in order to provide an incentive for the key employees to continue to work for TBHC, the board decided to adopt a KERP.  (Tr. at 18, 22.)

Mr. Weld testified that the adoption of a KERP was initially discussed among the senior executives, TBHC's Executive Compensation Subcommittee ("Compensation Committee"), and other members of the board.  (Tr. at 24.)  The board also consulted with counsel and TBHC's financial advisors.  (Tr. at 25.)  The board considered how many employees should be included in the KERP and whether it was justifiable.  <u>Id.</u>  Several types of plans were considered; one of

the proposals provided for $3 million in costs and another included 75 managers in the KERP. (Tr. at 25-27.)  The board eventually designed a plan that its members agreed upon, which was presented to the Committee.  (Tr. at 25.)

After receiving pay and bonus information concerning the key employees, as well as copies of their employment agreements, and after discussing the KERP with its financial advisors, the Committee suggested that the KERP be broadened beyond the senior management to include some lower ranking management employees.  (Tr. at 26, 88.)  The Committee also suggested that the KERP include a mitigation feature, whereby severance payments that a KERP beneficiary would be entitled to receive if he were terminated without cause would be reduced dollar-for-dollar by any payments received from another employer during the severance period. (Tr. at 26, 49.)  The board implemented the suggested changes, and the Committee supports the approval of KERP.

The KERP provides for two tiers of key employees.  The first tier consists of the three most senior TBHC employees: the chief executive officer ("CEO"), the executive vice president for administration and chief financial officer, and the senior vice president for operations, who is the chief operating officer.  Pursuant to the KERP, as an incentive to remain with the debtors, these employees would be entitled to receive a payment equal to 50% of their annual salary if they remain employed by TBHC on the effective date of the debtors' Chapter 11 reorganization plan (which the KERP defines as the date on which the plan is approved by the Bankruptcy Court).  If any of these employees is terminated for any reason other than for "cause" (as defined in the KERP) before the approval of a Chapter 11 plan, and if the terminated employee executes a release in connection with such termination, that employee shall be entitled to a severance

payment equal to his yearly salary.  Such severance payments would be made in installments and

payable at the usual times during the year, subject to a dollar-for-dollar reduction by the amount

of any compensation that the employee receives from another employer during the period.  At the

hearing, the debtors' counsel stated that KERP payments to first tier employees will not exceed

$600,000.00.  (Tr. at 52.)  However, this cap is not expressly provided in the KERP.

The second tier of employees included in the proposed KERP consists of TBHC's Chief

Medical Officer, Senior Vice President for Nursing, and the Vice President for Ambulatory Care.

TBHC's CEO may select additional employees to be included in this second tier.  The CEO will

determine the amount of the KERP payment for each of these employees; however, total KERP

payments to a second tier employee are capped at 25% of the employee's yearly salary.  Each

second tier employee would receive 50% of any KERP payment if the employee remains

employed by TBHC on the first anniversary of the Petition Date and would receive the balance of

the KERP payment if the employee remains continuously employed by TBHC on the date

TBHC's Chapter 11 plan is approved.  The aggregate KERP payments to the second tier

employees will not exceed $500,000.00.

At the hearing, the debtors' counsel stated that the total amount KERP payments would

not exceed $1.1 million, which is roughly one third of one percent of the debtors' annual revenue.

(Tr. at 52.)  The KERP payments would be given unsecured administrative expense status.  The

KERP would be administered by the Compensation Committee.

<u>Legal Standard</u>

The Bankruptcy Code does not expressly provide for the implementation of a KERP.

However, Section 363(b) provides that the trustee or debtor-in-possession, "after notice and a

hearing, may use sell, or lease, other than in the ordinary course of business, property of the

estate . . . ."  11 U.S.C. § 363(b)(1) (2006).  "In other words, where, as here, the debtor proposes

to enter into a transaction out of the ordinary course that will involve a commitment of the

estate's assets – e.g., its cash - and there are objections, the approval of the Court, after a hearing,

is required."  In re Adelphia Communications Corp., No. 02-41729, 2003 WL 22316543, *29

(Bankr. S.D.N.Y. March 4, 2003).

A court will apply the business judgment rule when determining whether to approve a

proposed KERP.  See Adelphia, 2003 WL 2316543, at *31.  "The business judgment rule 'is a

presumption that in making a business decision, the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'"  Id. at *30 (quoting Official Comm. of Subordinated Bondholders v.

Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992)).  This

presumption "shields corporate decision-makers and their decisions from judicial second-

guessing when the following elements are present: '(1) a business decision, (2) disinterestedness,

(3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of

discretion or waste of corporate assets.'"  Id. (quoting Integrated, 147 B.R. at 656.)  "Parties

opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the

presumption of validity."  Integrated, 147 B.R. at 656.

Courts will not interfere with a board's decision "as long as [the decision is] attributable

to any rational business purpose."  Integrated, 147 B.R. at 656 (quotation marks omitted); See

also In re Aerovox, Inc., 269 B.R. 74, 80 (D. Mass. 2001)("[A] debtor's business decision should

be approved by the court unless it is shown to be so manifestly unreasonable that it could not be

based upon sound business judgment, but only on bad faith, whim or caprice.")(quotation marks omitted).  Most courts considering a request to approve a compensation plan such as the KERP presented here have also examined whether the board's decision is fair and reasonable.  See In re U.S. Airways, Inc., 329 B.R. 793, 797 (Bankr. E.D. Va. 2005); In re Allied Holdings, Inc., 337 B.R. 716, 721-722 (Bankr. N.D. Ga. 2005); Aerovox, 269 B.R. at 81; In re Am. W. Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994).

It should be noted that the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 limits the circumstances in which KERP payments may be made to insiders, as well as the amount of such payments. Pub. L. No. 109-8, § 331, 119 Stat. 23, 102-03 (April 20, 2005). These new provisions are applicable only to cases filed after October 17, 2005, and are thus inapplicable in the instant case.  See U.S. Airways, 329 B.R. at 797-798.

## Discussion

NYSNA and the UST argue that on this record, it cannot be concluded that the board's decision to implement the KERP is a sound business decision.  (Tr. at 53.)  NYSNA argues that the debtor did not establish that the board exercised due care when it made the decision and that the decision of a not-for-profit corporation's board must meet a heightened standard of scrutiny. (Tr. at 54, 57.)  NYSNA also argues that the debtor did not establish that the decision is not a waste of corporate assets.  (Tr. at 54.)  The UST argues that the KERP should not be approved because there has not been any evidence of a realistic possibility that the debtor may lose its key employees.  There is no suggestion that the board is not disinterested or did not act in good faith.

A.  Due Care

NYSNA argues that the board is held to a higher standard of due care because TBHC is a not-for-profit corporation and further argues that the KERP should not be approved because a not-for-profit corporation cannot award bonuses.  NYSNA also argues that the board failed to establish that it exercised due care in adopting the KERP because there is no evidence that the board investigated whether assuming the pre-petition employment contracts with the key employees would be less costly than implementing the KERP.  (Tr. at 59-63.)  NYSNA further argues that the board did not exercise due care because it did not conduct a search to see if it could replace the current management with other professionals. NYSNA Objection, at 11-12, ¶¶ 35-39; (Tr. at 38.)

NYSNA relies on People v. Grasso, No. 401620/04, slip op. (N.Y. Sup. Ct. March 15, 2006), for the proposition that the awarding of executive bonuses by a not-for-profit corporation is against public policy in New York.  In Grasso, the New York state Attorney General alleged that the chairman and CEO of the New York Stock Exchange, Inc. ("NYSE") "improperly exert[ed] his influence as Chairman in the selection of members to the Compensation Committee and thereafter . . . pressur[ed] members to approve his compensation package, while failing to provide accurate and full disclosure regarding the extent of his compensation."  Id. at *4.  The compensation attacked by the Attorney General in Grasso allegedly amounted to 99% of NYSE's net income during the period.  Id. at *3.

The issue presented to the state court in Grasso was one of standing: whether the Attorney General had authority to enforce the provision of the New York Not-for-Profit Corporation Law that compensation of officers of not-for-profit corporations must be reasonable.  Id. at*4.  In

considering this issue, the <u>Grasso</u> court noted that not-for-profit corporations are "barred from distributing profits or net earnings to anyone" because "[n]ot-for-profits, unlike their for-profit counterparts, by definition and concept do not have shareholders to whom their profits are distributed." <u>Id.</u> at *5.

Here, the proposed KERP does not constitute a distribution of TBHC's profits to the KERP employees. The KERP payments are compensation, which may be paid so long as it is reasonable. The <u>Grasso</u> case provides no support for any contention that the proposed KERP payments are unreasonable in amount. The merits of the Attorney General's challenge to Mr. Grasso's compensation were not addressed by the court; moreover, the compensation issue in <u>Grasso</u> was of a wholly different order of magnitude than the payments proposed here (99% of NYSE's net income versus .33% of TBHC's income). Furthermore, as will be discussed below, here the board was disinterested and well informed with all material facts reasonably available to it and exercised due care in proposing the KERP. This Court finds that <u>Grasso</u> does not stand for the proposition that the proposed KERP violates state law.

NYSNA's argument that the board did not exercise due care in proposing the KERP fails as well. In order for the business judgment rule's protection to apply, a board must exercise "reasonable diligence in gathering and considering material information. In short, a [board]'s decision must be an informed one." <u>Hanson Trust PLC v. ML SCM Acquisition Inc.</u>, 781 F.2d 264, 274 (2d Cir. 1986)(quotation marks omitted). The board's investigation and procedure must not be "so restricted in scope, so shallow in execution, or otherwise so [p]ro forma or halfhearted as to constitute a pretext or sham. . . . " <u>Id.</u> (quoting <u>Auerbach v. Bennett</u>, 47 N.Y.2d 619, 634 (N.Y. 1979)); <u>See also</u> <u>In re Mid-State Raceway, Inc.</u>, 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005).

Here, the record amply reflects that such due care was exercised.  The board consulted with its counsel and financial advisors, formulated several proposals, reduced the amount to be paid pursuant to the KERP, and, after negotiations with the Committee, broadened the scope of employees included and added a mitigation clause to the severance payment provision.  In his affidavit in support of the debtors' motion, Mr. Weld stated that the board considered which employees to include in based on "(i) the importance of [the employee's] job functions to the [d]ebtors' overall restructuring efforts, (ii) the importance of the [employee's] individual performance of these functions, and (iii) the risk that the [employee] would seek alternate employment if he or she were not included in the KERP, balanced against the [d]ebtors' ability to replace the [employee] if he or she chose to leave."  Weld Aff. at 2, ¶ 4.; See also Allied, 337 B.R. at 723 (reasonable factors to identify key employees are the employee's necessity to operations and reorganization, possession of unique skills and abilities, risk of leaving, performance of heavy work loads since the bankruptcy filing and the difficulty of replacing the employee).  Furthermore, the KERP payments were structured so that for senior management, no payment may be made until the effective date of the debtors' Chapter 11 plan; and for other employees, at least half of any KERP payment is deferred until that date.  See id. at 726 (the court would approve the KERP if the incentive payments "will be payable in three installments, the first payable upon the filing of the plan, the second payable upon confirmation of the plan, and the third payable 60 days after the effective date of the plan").

Contrary to NYSNA's argument, in order to exercise due care, the board was not required to investigate whether it would be less costly to assume the senior management's pre-petition employment contracts or adopt the KERP.  The proposed KERP and the pre-petition employment

contracts are unrelated.  The KERP is a post-petition proposal and is designed to retain key

employees through the bankruptcy process, and is tied to confirmation of a reorganization plan.

See Am. W., 171 B.R. at 677 (finding that "the proposed bonuses ha[ve] nothing to do with a

new [wage] plan . . . . [T]he Board did not consider the wage issue in determining the proposed

success bonuses and the success bonuses must therefore stand on their own merit"); see also In re

Georgetown Steel Co., 306 B.R. 549, 556 (Bankr. D.S.C. 2004) ("Retention plans are usually

proposed by debtors to encourage certain crucial employees to remain with the company through

a critical, transitional time period when the exact future of the company is unclear and when

those employees would be most likely to search for other employment.").  There is no reason why

TBHC should be required to consider assuming any pre-petition employment contracts with the

key employees, prior to proposing the KERP, any more than TBHC should be required to

consider instead proposing any other particular form of agreement with the key employees.  In

fact, the record shows that the board considered several other forms of agreement prior to

arriving at the KERP that is now presented for approval.

       NYSNA's argument that the board did not exercise due care because it failed to search for

replacement employees also fails.  Mr. Weld testified that a change in management would hinder

TBHC's business reorganization efforts, because "it would be difficult to a have somebody come

in and get up to speed in terms of the important issues to us."  (Tr. at 48.)  Mr. Weld also testified

that it took several months for the board to fill TBHC's CEO vacancy in 2002 and that a search

firm was compensated for its search, even though the position was ultimately filled by TBHC's

vice president.  (Tr. at 46.)  It is well known that "[h]iring employees from the outside not only

impacts the [d]ebtors' productivity, but also costs the [d]ebtors in time and money to recruit

(executive search firm fees and relocation expenses) and to train new employees." <u>Allied</u>, 337

B.R. at 722-723.  Furthermore, the board cannot look to fill a senior management position

without having a vacancy to fill, and, even if the board were to search for a replacement in the

event that a senior employee leaves, there is no guarantee that the potential replacement would be

available at the particular time in the future when the employee decides to leave.

In short, the board utilized a procedure which involved analysis based on all of the

material facts reasonably available to it, including the views of the Committee.  Accordingly, the

board exercised due care when it developed the KERP.

B.  Waste of Corporate Assets

NYSNA argues that the debtor did not establish that it is not wasting corporate assets by

implementing the KERP.  This contention is also unsupported by the record.

Waste of corporate assets entails "payments of corporate funds, either where there is a

lack of consideration, or a 'clearly inadequate consideration.'" <u>Berman v. Le Beau Inter-Am., Inc.</u>,

62 B.R. 262, 267 (S.D.N.Y. 1986)(quoting <u>Aronoff v. Albanese</u>, 85 A.D.2d 3, 5 (N.Y. App. Div.

1982)).  "[I]n order to establish a[] . . . waste of assets, it must be demonstrated that no person of

ordinary sound business judgment would say that the corporation received fair benefit.  If

ordinary businessmen might differ on the sufficiency of consideration received by the

corporation, the courts will uphold the [board's decision]." <u>Id.</u>

Based on the record, it is clear that the proposed KERP is not a waste of corporate assets.

The KERP payments will not exceed $1.1 million, which is roughly one-third of one percent of

the debtors' annual revenue.  This is a reasonable amount.  Moreover, KERP payments will not

be made until the effective date of a Chapter 11 plan (except in the case of tier two employees,

who may receive 50% of their KERP payments, not to exceed $250,000.00 in the aggregate, on the first anniversary of the Petition Date).  Therefore, unless the debtors' reorganization effort is successful, no KERP payments will be made at all, except for the initial payment to tier two employees.  "Confirmation awards to senior executives are common and tend to be very significant amounts."  Am. W., 171 B.R. at 678.  In exchange for the KERP payments, the key employees will remain within the debtors' employment and continue to work to operate and reorganize the debtor.  It is clear that the consideration received in exchange for the KERP payments serves an important corporate interest and is not "inadequate consideration." See Berman, 62 B.R. at 267.

Therefore, the board exercised due care when it adopted the KERP and the KERP is not a waste of corporate assets.  Additionally, the monetary cap on the KERP payments, as well as terms under which a key employee would receive his payments, the timing of the payments, and the mitigation factor relating to the severance payments, all support a finding that the KERP is fair and reasonable.  See Allied, 337 B.R. at 724-25 ("The Court's overall conclusion that the KERP is fair and reasonable is supported by the fact that . . . the KERP was designed with the assistance of an outside consulting firm . . . that the KERP provides benefits for a broad range of employees, rather than just the top level of executives [and] that the KERP, as originally proposed represents only .5% of the [d]ebtors' revenue and falls well within the range of KERPs approved in other bankruptcy cases, both as to the total cost and the amount of the benefits offered.").

C.  Evidence of Realistic Possibility of Losing the Key Employees

Mr. Weld testified that at least one of TBHC's key employees has been approached by a headhunter.  The UST argues that the KERP should not be approved because, notwithstanding this testimony, insufficient evidence has been produced that the debtor is at risk of losing its key employees.  This argument must be rejected, because it is not necessary, under the law applicable to this case, for the proponent of a KERP to show that the employees to be covered by the plan have actual job offers from competitors of the debtor.  Nor is it appropriate, under applicable law, for the Court to second guess the board's determination that the KERP is needed.

The board decided which employees to include in the KERP based on numerous considerations, which are discussed above.  It is not the role of the Court to second guess which employees the board decides to include in the KERP.  See In re Pac. Gas and Elec. Co., 2001 WL 34133840, at *2 (Bankr. N.D. Cal. July 13, 2001).  Nor is the Court required to "review each individual employee's likelihood of leaving absent a retention bonus . . . ." Id.  "Inasmuch as it [is] clear . . . that each Key Employee perform[s] a function necessary to [the debtor] at this crucial stage, it is natural for [the debtor] and its [b]oard to be concerned about even the slightest risk of turnover at this critical time." Georgetown, 306 B.R. at 557.

## Conclusion

Because the board's adoption of the proposed KERP satisfies the business judgment rule, and because the KERP is fair and reasonable, the debtors' motion for approval of the KERP is granted, provided that the KERP is amended to expressly limit the total KERP payments to

tier one employees to $600,000.00 in the aggregate and total KERP payments to all employees to

$1.1 million in the aggregate.

       The debtors are directed to settle an order consistent with this decision.

Dated: Brooklyn, NY
      May 4, 2006

                          ***s/Carla E. Craig***
                            CARLA E. CRAIG
              United States Bankruptcy Judge