# EXHIBIT A-2

## Revised 2006 Institutional Cost Report Procedures Engagement Letter

SSL-DOCS1 1806819v3



**Ernst & Young LLP**
5 Times Square
New York, New York 10036-6530

■ Phone: (212) 773-3000
www.ey.com

May 1, 2007

Mr. Charles Figliozzi
Vice President – Finance Administration, Finance & Tax
The Brooklyn Hospital Center
121 DeKalb Avenue
Brooklyn, New York 11201

## 2006 Institutional Cost Report Procedures (Revised)

Dear Mr. Figliozzi:

This letter agreement (the "Agreement") between Ernst & Young LLP ("we" or "E&Y") and The Brooklyn Hospital Center (the "Company") is effective as of the date hereof and supersedes the prior agreement between E&Y and the Company, dated November 27, 2006, for the performance of accounting and auditing services related to the Company's Annual Institutional Cost Report of Hospitals and Hospital Healthcare Complexes subsequent to the Company's filing of a Chapter 11 petition in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

This Agreement reflects the finalized reporting requirements pertaining to Annual Institutional Cost Report of Hospitals and Hospital Healthcare Complexes which were communicated to the Company by the New York State Department of Health in a letter dated April 4, 2007.

This letter also serves as an addendum to a separate letter between E&Y and the Company related to Financial Statement Audit Services which was also dated November 27, 2006.

### E&Y's Responsibilities

We will examine and report on the following supplemental data, which are the responsibility of management and are presented for the purpose of additional analysis and are not required as part of the basic financial statements, as required by the applicable instructions relating to the preparation of the Annual Institutional Cost Report of Hospitals and Hospital Healthcare Complexes (the "Cost Report") as furnished with the EICR software by the New York State Department of Health for the year ended December 31, 2006.

    Supplemental financial data:
        Exhibit 11 (columns 1 through 3)
        Exhibit 18
        Exhibits 23 through 26A
        Exhibit 28

≡ℓℓ ERNST & YOUNG                              ■ Ernst & Young LLP

      Exhibit 40
      Exhibit 46
      Exhibit 47 - Line 50 in columns 4801 and 4802
   Supplemental statistical data:
      Exhibit 20
      Exhibit 30 columns 4031 and 0214
      Exhibit 36

We will conduct our examination of the supplemental data in accordance with attestation standards established by the American Institute of Certified Public Accountants (AICPA). The objective of our examination is to express an opinion on whether the supplemental data described above has been prepared, in all material respects, in conformity with the applicable instructions relating to the preparation of the Cost Report as furnished with the EICR software by the New York State Department of Health for the year ended December 31, 2006.

In addition, in accordance with auditing standards generally accepted in the United States, we will express an opinion that the supplemental data are fairly stated in all material respects when considered in conjunction with the basic financial statements, taken as a whole.

We also will perform the agreed-upon procedures as indicated in Exhibit A to this Agreement related to the supplemental statistical data in Exhibit 19 of the Cost Report ("Agreed-Upon Procedures"). We will conduct our agreed-upon procedures engagement under attestation standards established by the AICPA. The Agreed-Upon Procedures have been agreed to by the Company's Board of Trustees and management and the New York State Department of Health, on behalf of itself and the other Offices and Agencies of the State of New York (the "Specified Parties"), solely to assist the Specified Parties in evaluating the Company's compliance with the New York State Department of Health, Commissioner of Health's Administrative Rules and Regulations, Part 86-1.6(a) for the year ended December 31, 2006. E&Y makes no representation as to the sufficiency of the Agreed-Upon Procedures for the Specified Parties' intended purposes or for any other purpose. E&Y will communicate all modifications to the Agreed-Upon Procedures to the Specified Parties for their agreement. Our report will include all findings from the application of the Agreed-Upon Procedures.

The Services and the information, records, data, advice or recommendations contained in any reports, materials, presentations or other communications, written or otherwise, in draft or final form, provided by E&Y (collectively, "Reports") are intended solely for the information and use of the Company's management and the other Specified Parties. The Company may not rely on any verbal Reports (that are not confirmed by E&Y in writing) or draft written Reports. Other than the information provided to the New York State Department of Health as part of this engagement, except where compelled by legal process (of which the Company shall promptly inform E&Y so that E&Y may seek appropriate protection) the Company may not disclose, orally or in writing, any report or any portion, abstract or summary thereof, or make any reference to E&Y in connection

≡!! ERNST & YOUNG                    ■ Ernst & Young LLP

therewith, to any third party without obtaining (a) the prior written consent of E&Y and (b) an executed letter substantially in the form of Exhibit B to this addendum engagement letter from such party. To the extent the Company is permitted to disclose any written Report as set forth herein, it shall disclose such Report only in the original, complete and unaltered form provided by E&Y, with all restrictive legends and other agreements intact. Management of the Company is responsible for determining whether Reports satisfy legal, regulatory, or contractual requirements applicable to the Company. The Company acknowledges and agrees that the Company has the ultimate responsibility for all management decisions relating to the Services.

Should conditions not now anticipated preclude us from completing our examination and agreed-upon procedures on the applicable supplemental data, and issuing our reports thereon, E&Y will advise the Company and the other Specified Parties promptly and take such action as we deem appropriate.

**Specified Parties' Responsibilities**

Management of the Company is responsible for the preparation of the supplemental data in conformity with the applicable instructions relating to the preparation of the Cost Report as furnished with the EICR software by the New York State Department of Health for the year ended December 31, 2006. Management also is responsible for the compliance of the Company with the New York State Department of Health, Commissioner of Health's Administrative Rules and Regulations, Part 86-1.6(a) and for the information contained in Exhibit 19 of the Cost Report for the year ended December 31, 2006. In addition, management is responsible for identifying applicable compliance requirements, establishing and maintaining internal control to provide reasonable assurance of compliance with those requirements, and evaluating and monitoring the Company's compliance.

The Specified Parties have reviewed the Agreed-Upon procedures and have agreed to the sufficiency of those procedures for their respective purposes. The sufficiency of the Agreed-Upon Procedures for the Specified Parties' purposes shall be solely the responsibility of the Specified Parties.

The Company shall, among other responsibilities with respect to the Services, (i) make all management decisions and perform all management functions, including determining account codings and approving all proposed journal entries in connection with any Services hereunder; (ii) assign a competent employee to oversee the Services and evaluate their adequacy and results; (iii) accept responsibility for the implementation of the results or recommendations contained in the Reports or otherwise in connection with the Services; and (iv) establish and maintain internal controls over related Company processes.

The Company represents and warrants to E&Y that its Board of Trustees has authorized the Company to enter into this Agreement and the person signing this Agreement is expressly authorized to execute it on behalf of, and to bind, the Company.

≡ℓ ERNST & YOUNG                               ■ Ernst & Young LLP

*Staffing for Provision of Services*

Thomas M. Griffith will be the Partner responsible for the provision of the Services. Thomas M. Griffith and David J. Wiessel, Senior Manager, will work closely with management in performing the required Services. If one or more of these individuals ceases to provide the Services to the Company pursuant to the Agreement, Ernst & Young will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other partners and staff, not identified herein, may be utilized as required to conduct our work in the most efficient manner possible.

**Fees and Billings**

Our fees will be based on actual time incurred at discounted hourly rates, in effect for the Ernst & Young professionals assigned to provide the category of services set forth in the Agreement; our rates are revised annually, effective May 1. The actual time required will depend upon the extent and nature of available information, modifications to the scope of our engagement and other developments that may occur as work progresses.

Effective May 1, 2007, those hourly rates (as discounted) are as follows:

| | |
|---|---|
| Partners and Principals | $657 - $699 |
| Executive Director | $641 |
| Senior Manager | $581 - $632 |
| Manager | $447 - $514 |
| Senior | $333 - $413 |
| Staff | $202 - $253 |

We will request payment of our fees and any modification to the scope of our engagement in accordance with the Bankruptcy Code, the Bankruptcy Rules, local bankruptcy rules for the Eastern District of New York, and any relevant administrative orders. In addition, we will request reimbursement of our actual expenses related to this engagement, as well as fees for any time (including any time or reasonable expenses of legal counsel) we may incur in considering or responding to discovery requests or participating as a witness or otherwise in any legal, regulatory, or other proceeding as a result of our performance of these services.

E&Y may receive rebates in connection with certain purchases, which are used to reduce overhead charges that E&Y would otherwise pass on to its clients.

In the event we are requested or authorized by the Company or are required by government regulation, subpoena, or other legal process to produce our documents or our personnel as witnesses with respect to our engagements for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought,

**ERNST & YOUNG**                               ■ Ernst & Young LLP

reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such requests.

**Other Matters**

*Alternative Dispute Resolution*

Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the Services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Company or of Ernst & Young) shall be brought in the Bankruptcy Court or the District Court if such District Court withdraws the reference and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have or retain jurisdiction over such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court or the District Court upon withdrawal of the reference does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Attachment 1 to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon the Company, Ernst & Young and any and all successors and assigns thereof.

*Confidentiality of Information*

We recognize and acknowledge that certain information and documentation which we may request in connection with our provision of all services pursuant to the Agreement is proprietary and confidential, including, without limitation, nonpublic financial and business information documents hereafter furnished to us or obtained by us from the Company. By signing this letter we confirm and agree that we will not disclose, distribute, publish, or release to any third party any of the information or documents now or hereafter received or obtained by us in this engagement, except as required by law as to which we will give the Company prior written notice. All obligations as to nondisclosure by us shall cease as to any part of such information to the extent that such information is or becomes public other than as a result of acts by us.

To the extent information obtained from the Company constitutes protected health information pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), as amended from time to time, this Agreement shall be deemed to incorporate all terms that HIPAA requires to be included in a business associate contract pertaining to such information.

≡℧ *ERNST & YOUNG* ■ Ernst & Young LLP

*Miscellaneous*

The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

This Agreement may be terminated at any time by the Company or E&Y, but in any event this Agreement will expire upon the effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. The provisions of this Agreement set forth in the sections entitled "Fees and Billings" and "Other Matters", including, but not limited to the alternative dispute provision in the Agreement, will remain operative and in full force and effect regardless of any termination or expiration of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization, liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or in part, the remaining portions of this Agreement shall remain in full force and effect.

As set forth herein, the Company has requested that Ernst & Young provide audit and accounting services, the scope of which is set forth in the Agreement. The Company recognizes and acknowledges that by performing the services set forth in the Agreement, Ernst & Young is not acting in any Company management capacity and that the Company has not asked Ernst & Young to make, nor has Ernst & Young agreed to make, any business decisions on behalf of the Company. All decisions about the business or operations of the Company remain the sole responsibility of the Company's management and its board of trustees.

The Company shall not, during the term of this Agreement and for 12 months following its termination for any reason, without the prior written consent of E&Y, solicit for employment or a position on its Board of Trustees, or hire or appoint to its Board of Trustees, any current or former partner, principal, or professional employee of E&Y, any affiliate thereof, or any other member of the global Ernst & Young network or any of their respective affiliates, a) if such partner, principal, or professional employee has been involved in the performance of any audit, review, or attest service for or relating to the Company at any time during the then current fiscal year of the Company up to and including the date of the audit report for that year, or in the 12 months preceding the audit report date for the immediately preceding fiscal year and b) unless such partner, principal, or professional employee does not influence E&Y's operations or financial policies and has no capital balances or any other financial arrangement with E&Y.

From time to time, and depending upon the circumstances, personnel from any affiliate of E&Y, any other member of the global Ernst & Young network or any of their respective affiliates other than E&Y, and from independent third party service providers (including independent contractors), may participate in providing the Services.

≡𝑙 ERNST & YOUNG                                  ■ Ernst & Young LLP

If any portion of this agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this agreement shall remain in effect.

By agreement to the provision of the services set forth in the Agreement, Ernst & Young is not providing a guarantee to the Company that Ernst & Young's performance of those services pursuant to the terms and conditions set forth in the Agreement will guarantee the Company's successful reorganization under Chapter 11 of Title 11 of the United States Code.

If the foregoing is acceptable to you, please so acknowledge by signing this letter in the space indicated below and return it to Thomas M. Griffith, Ernst & Young LLP, 99 Wood Avenue South, Iselin, New Jersey 08830.

                                        Yours very truly,

                                        *Ernst + Young LLP*

Agreed and accepted by:
The Brooklyn Hospital Center

By: *Charles Figliozzi*
    Charles Figliozzi
    Vice President – Finance Administration, Finance & Tax

__5/9/07__
Date

≡Ɪl ERNST & YOUNG                                         ■ Ernst & Young LLP

## Engagement Letter Exhibit A
## Agreed-Upon Procedures Related to Exhibit 19 of the Cost Report

1. Compare statistical bases used for each column on 2006 Exhibit 19 to statistical bases used for each column on 2005 Exhibit 19. Compare any changes in statistical bases to the Medicare intermediary approval letter. Obtain explanation from management for any change in bases and include as a finding.

2. Compare statistical bases used on the 2006 Exhibit 19 to Worksheet B-1 of CMS-2552 (Medicare Cost Report). Compare any changes in statistical bases to the Medicare intermediary approval letter. Obtain explanation from management for any change in bases or any bases for which Exhibit 19 differs from Worksheet B-1 and include as a finding.

3. Obtain from Company Management documentation of their methodology and procedures for accumulating each statistical base used in the 2006 Exhibit 19 and attach in the prescribed form as Attachment A, Statistical Base, Methodology and Procedures for Accumulating the Statistic, and Source Document. [Note: For example, if the statistic is pounds of laundry, the Company needs to describe how the weight and/or pieces are determined and how they are accumulated by Cost Center for Exhibit 19.] Inspect the documentation, compare the documentation to the statistical bases on Exhibit 19 and include as a finding any statistical base for which there is no documentation or for which the documentation does not agree with Exhibit 19. [Note: Statistics will be compared to source documents in Procedures 5, 7, and 8.]

4. Obtain a schedule from management which calculates the percentage change in line 960 for all columns on 2006 Exhibit 19 to line 960 for all the corresponding columns on 2005 Exhibit 19 and recalculate the Company's calculations for mathematical accuracy. For those changes greater than 5% (e.g., 500 basis points), inquire of management as to the reason for the changes. [Note: Identify in Attachment B those columns with a change greater than 5%, the title of individual to whom the inquiry was made, and the reason the individual provided for the change.]

5. For all columns identified in Procedure 4, compare the amount reported on each line in the columns to original source documentation provided by management in Procedure 3. [Note: Identify in Attachment B the source documentation to which the statistic was compared, the process utilized by the Company to accumulate such statistic, and any differences or lack of documentation noted.] Include as a finding any differences or lack of documentation that were noted.

6. For 2005 Exhibit 19 and 2006 Exhibit 19, obtain a schedule from management which compares the percentage of line 960 that represents:

≣⫽ ERNST & YOUNG                    ■ Ernst & Young LLP

    a. Total Inpatient Routine Service Cost Centers
    b. Total Outpatient Service Cost Centers
    c. Total Non-reimbursable Cost Centers

Recalculate the Company's calculations for mathematical accuracy. For those changes between 2006 and 2005 wherein there is an absolute change of greater than 5 percent (e.g., 500 basis points) for any of the above three categories of costs, inquire of management as to the reason for the changes. Identify in Attachment C those columns, category of costs (and cost centers within the category) wherein there is an absolute change in the relationship by more than 5 percentage points (e.g., 500 basis points) for any of the three categories, the title of individual to whom the inquiry was made, and the reason provided by the individual for the change.

7. For all cost centers within the three categories of costs subjected to inquiry procedures pursuant to Procedure 6 above and included on Attachment C, compare the amount reported on each line number to original source documentation provided by management in Procedure 3. [Note: Identify in Attachment C, the source documentation to which the statistic was compared, the process utilized by the Company to accumulate such statistic, and any differences or lack of documentation noted.] Include as a finding any differences or lack of documentation that were noted.

8. For all cost centers established by the Company exclusively for capital purposes (including but not limited to 001, 002, 042 and 043) that have not been selected for testing in Procedures 4 or 6, compare the amount reported on each line number in the columns to original source documentation provided by management in Procedure 3. [Note: Identify in Attachment D the column, the statistic tested, the source documentation to which the statistic was compared, and the process utilized by the Company to accumulate such statistic, and any differences or lack of documentation noted.] Include as a finding any differences or lack of documentation that were noted.

≣*J* ERNST & YOUNG                    ■ Ernst & Young LLP

Attachment A to Engagement Letter Exhibit A

Attachment A - Documentation of Statistical Bases- Procedure 3

[Name of Facility]

| Statistical Base | Methodology | Source Documentation |
|---|---|---|
|  |  |  |

  ■ Ernst & Young LLP

Attachment B to Engagement Letter Exhibit A

Attachment B - Procedures 4 and 5

[Name of Facility]

| Column | Statistic | Company Representative | Reason for Change | Source Documentation | Methodology | Differences |
|--------|-----------|------------------------|-------------------|----------------------|-------------|-------------|
|        |           |                        |                   |                      |             |             |

# ⁐ ERNST & YOUNG

■ Ernst & Young LLP

Attachment C to Engagement Letter Exhibit A

Attachment C - Procedures 6 and 7

[Name of Facility]

| Column | Statistic | Company Representative | Reason for Change | Source Documentation | Methodology | Differences |
|--------|-----------|------------------------|-------------------|----------------------|-------------|-------------|
|        |           |                        |                   |                      |             |             |

A member firm of Ernst & Young Global Limited

 ■ Ernst & Young LLP

Attachment D to Engagement Letter Exhibit A

Attachment D - Procedure 8

[Name of Facility]

| Column | Statistic | Company Representative | Reason for Change | Source Documentation | Methodology | Differences |
|--------|-----------|------------------------|-------------------|----------------------|-------------|-------------|
|        |           |                        |                   |                      |             |             |

≡*ll* ERNST & YOUNG                         ■ Ernst & Young LLP

## Exhibit B

## SPECIFIED USER REPORT ACCESS LETTER
### Agreed Upon Procedures

Ernst & Young LLP
[insert address of E&Y office]

Attention: [insert name of partner]

Ladies and Gentlemen:

We understand that Ernst & Young LLP ("E&Y") has been engaged by [insert name of Client] ("Client") to perform certain agreed-upon procedures with respect to [insert type of service] (the "Services"). We have requested that Client deliver to us, when available, a copy of the report(s) (including any portion, abstract and/or summary thereof, the "Report(s)") [to be] prepared by E&Y in connection with the Services.

We agree that (1) the procedures [to be] performed by E&Y at the request of Client, a copy of which we have reviewed (the "Procedures"), are sufficient for our purposes and we take responsibility for the sufficiency of the Procedures; (2) E&Y has made no representation or warranty to us as to the sufficiency of the Procedures or otherwise with respect to the Services or the Report(s); and (3) had E&Y been engaged to perform additional procedures, other matters might [have] come to E&Y's attention that would [be][have been] addressed in the Report(s).

The Services [do][did] not constitute (1) an audit, review, or examination of financial statements conducted in accordance with generally accepted auditing standards of the American Institute of Certified Public Accountants ("AICPA") or the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"); (2) an examination of prospective financial statements in accordance with applicable professional standards; or (3) procedures to detect fraud or illegal acts. We further acknowledge and agree that (1) we do not acquire any rights against E&Y, any other member firm of the global Ernst & Young network, or any of their respective affiliates, partners, agents, representatives, or employees (collectively, the "E&Y Parties"), and E&Y assumes no duty or liability to us, in connection with our access to the Report(s) or with respect to the Procedures, and (2) we will not contend that any provisions of the United States or state securities laws could invalidate or avoid any provision of this letter.

In addition, except (1) where compelled by legal process (of which we shall promptly inform E&Y and tender to E&Y, if E&Y so elects, the defense thereof); (2) with respect to any contents of the Report(s) relating to the tax treatment and tax structure of any transaction (including any facts that may be relevant to understanding the proposed tax treatment of any transaction); or (3) with E&Y's prior written consent, we will not disclose, orally or in writing, any Report, or make any reference to E&Y in connection

≡ll ERNST & YOUNG                    ■ Ernst & Young LLP

therewith, in any public document or to any third party. To the extent we are permitted to disclose the Report(s) as set forth herein, we shall disclose [it][them] only in the original, complete and unaltered form provided by E&Y, with all restrictive legends and other agreements intact, and we will advise the party to whom we disclose the Report(s) that it may not rely on, use, circulate, quote, or otherwise refer to the Report(s) for any purpose.

We (for ourselves and our successors and assigns) hereby release each of the E&Y Parties from any and all claims or causes of action that we have, or hereafter may or shall have, against them in connection with the Report(s), our access to the Report(s), or E&Y's performance of the Services. We shall indemnify, defend, and hold harmless the E&Y Parties from and against all claims, liabilities, losses and expenses suffered or incurred by any of them arising out of or in connection with (1) any breach of this letter by us or our representatives; and/or (2) any use or disclosure of, or reliance on, the Report(s) by any other party that obtains access to the Report(s), directly or indirectly, from or through us or at our request.

This letter shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and fully to be performed therein by residents thereof.

Very truly yours,

**[Insert Name of Report User]**

By: _____
    Name:
    Title:

**≡ℲERNST&YOUNG**                           ■ Ernst & Young LLP

# Attachment 1 to Engagement Letter

## Dispute Resolution Procedures

*Mediation*

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

*Arbitration*

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the

⹃ ERNST & YOUNG                    ■ Ernst & Young LLP

dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.